## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KAREEM EADDY, | CIVIL ACTION |
| Plaintiff, | NO. _____ |
| v. | |
| CITY OF PHILADELPHIA, RONALD DOVE, and GEORGE FETTERS, in their individual capacities, | **COMPLAINT** |
| Defendants. | |

Plaintiff, Kareem Eaddy, by and through his attorneys, the Marrone Law Firm, LLC, hereby alleges as follows:

PRELIMINARY STATEMENT

1.      Kareem Eaddy was wrongfully convicted of having killed Christopher Lomax, a man that Eaddy never met and never heard of. The conviction was secured through the unconstitutional misconduct and deliberate indifference of defendants Ronald Dove, George Fetters and other members of the Philadelphia Police Department ("PPD"). This conduct constituted violations of Mr. Eaddy's rights under the 4th and 14th Amendments to the constitution. Moreover, these violations were caused by a longstanding custom and practice of the City of Philadelphia in its management and supervision of the PPD and, in particular, the individual defendants.

2.      At trial, no one testified that they saw who shot and killed Christopher Lomax on June 22, 2008. The Commonwealth's case was thin, and it is no wonder that Philadelphia police and the Defendants herein had to engage in unconstitutional conduct to obtain the conviction.

3.    The Commonwealth's theory was that there was an argument in a bar and that the argument spilled out into the street where there was a shooting that left Christopher Lomax fatally shot. The Commonwealth argued that the person in the argument was the shooter.

4.    In order for this theory to be successful, Philadelphia Police Detectives George Fetters and Ronald Dove coerced and fabricated statements from witnesses Renee Smith and Lakia Bunch. Both witnesses testified under oath that they did not give the statements that were attributed to them. In the case of Bunch, the signature on her statement was eventually proven to be a forgery. The statement attributed to Renee Smith was not signed at all. Both detectives testified that the statements were genuine.

5.    The Commonwealth knew its case was weak, so it attempted to bolster its claims with testimony Jhalil Miller and Kwame Mapp. Neither of these men claimed to have seen the shooting, but they did claim to have heard from eyewitness Tyree Graham that Eaddy had shot Lomax.

6.    Graham himself testified to being at the scene but denied knowing who was in the fight with Lomax and who shot Lomax. More importantly, Graham also denied having told anything to Miller and Mapp about who shot Lomax.

7.    PPD Detective George Fetters helped turn the Miller and Mapp testimony into a stronger point for the prosecution. Jahlil Miller tried to recant when he was first brought to the stand. His testimony was then delayed until the next day so that Miller could consult with his attorney. During that second time on the stand, Miller implicated Kareem Eaddy. Miller went on to take the stand a third time to say how he was assaulted by other prisoners on a prison transportation bus after testifying against Eaddy. Miller claimed in a statement given to Fetters that Miller's assailants on the bus were retaliating on Eaddy's behalf. The Commonwealth,

however, was unable to provide any evidence that Eaddy had anything to do with the assault. Sadly, this created a "witness intimidation" narrative that the Commonwealth, with essential assistance from Fetters, was able to use to get its conviction.

8.      Mr. Eaddy now brings this action under 42 U.S.C. § 1983 seeking redress for police misconduct that violated the Plaintiff's constitutional rights and caused him to be incarcerated for more than 14 years.

## JURISDICTION AND VENUE

9.      This action is brought pursuant to 42 U.S. § 1983 no redress the deprivation under color of law of the Plaintiff's rights as secured by the United States Constitution.  This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

10.      This Court has supplemental jurisdiction over the plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

11.      Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

## JURY DEMAND

12.      Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

13.      Plaintiff **Kareem Eaddy** is, and at all times relevant to this Complaint was, a resident of Pennsylvania. Mr. Eaddy was born August 19, 1984. On February 9, 2011, Mr. Eaddy was wrongfully convicted of the first-degree murder of Christopher Lomx and, as a result, served more than 14 years in prison.  Only when evidence of the Defendants' wrongful, illegal and

unconstitutional conduct and Mr. Eaddy's innocence came to light years later was there a basis for his original charges, convictions and sentence to be vacated and he was able to be released from prison

14.    Defendant **City of Philadelphia** is, and at all times relevant to this Complaint was, a municipality located in the State of Pennsylvania.  The City of Philadelphia was, at all times relevant to this Complaint, officially responsible for the policies, practices and customs of the Philadelphia Police Department ("PPD"), and was the employer of the individual PPD Defendants in this matter.

15.    Defendant **Ronald Dove**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Dove was assigned as a detective with the Homicide Division at the time of this investigation.

16.    Defendant **George Fetters**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Fetters was assigned as a detective with the Homicide Division at the time of this investigation.

17.    Defendants Dove and Fetters are collectively referred to herein as "Individual Defendants."

18.    At all times relevant to this Complaint, the individual Defendants named above acted in concert and in conspiracy with one another in order to deprive Mr. Eaddy of his constitutionally protected rights.

FACTUAL ALLEGATIONS

19.     The shooting death of Christopher Lomax took place on June 22, 2008, outside a bar in Philadelphia. Lomax was celebrating his birthday that night with his friend Tyree Graham. At some point in the night there was an altercation in the bar between Lomax and another individual. That incident quickly diffused. Sometime later, Lomax left the bar and was fatally shot outside.

20.     The Commonwealth's theory of the case was that Kareem Eaddy was the person arguing with Lomax in the bar and was the person who shot him outside.

21.     The Commonwealth case relied on the testimony of four witnesses who were at the bar that night: Renee Smith, Lakia Bunch, Tyree Graham, and Darnell Clark. At trial, none of these individuals stated that they saw who shot Lomax. Smith and Bunch were impeached with prior statements that implicated Eaddy. Graham testified that he did not see who shot Lomax and Eaddy was not involved in the altercation with Lomax. Clark testified that he saw the argument in the bar but not the shooting. A prior statement by Clark contained a photo identification of Eaddy, but at trial Clark testified that Eaddy was not the person in the argument with Lomax in the bar.

22.     Graham was the first witness. He testified that he did not see who shot his friend. Graham remembered talking to some women outside the bar with Mr. Lomax, when he heard gunshots. He immediately ran toward his car. When he looked back in the direction of the gunfire, he saw Mr. Lomax lying on the ground.

23.     The prosecution's next two witnesses, Kwame Mapp and Jahmil Miller, were friends of Mr. Graham. Although neither was present at the bar on the night in question, they

both testified that Mr. Graham, contrary to Graham's own testimony, informed them that he witnessed Eaddy shoot Mr. Lomax outside of the bar.

24.    It is notable that both waited months after the shooting to report this information to the police, and Mr. Miller only did so when he was facing criminal charges of his own.

25.    Witness Darnell Clark, another friend of Mr. Lomax, testified that he was at the bar to celebrate Mr. Lomax's birthday.

26.    Inside the bar on the way to the dance floor, Mr. Clark saw Mr. Lomax and another individual bump into each other. Though he could not hear the words that were exchanged, Mr. Clark felt that he needed to intervene based on their body language. So, Mr. Clark and Mr. Graham separated Mr. Lomax and the other individual.

27.    Mr. Clark described this individual as five foot nine inches, approximately one hundred forty-five pounds, and in his thirties. For comparison, during the relevant period, Mr. Eaddy was five foot seven inches, one hundred ninety pounds, and twenty-three years old.

28.    Mr. Clark did not see the shooting itself as he was still in the bar when it occurred.

29.    A few months after providing this information to the police, Mr. Clark was approached by detectives and presented with a photo array. He was asked to identify the individual who was involved in the confrontation with Mr. Lomax.

30.    According to Clark's statement, he selected the photo of Kareem Eaddy. At trial, however, Mr. Clark testified at trial that he did not recognize anyone in the courtroom who was at the bar on the night of the shooting

31.    When Renee Smith took the stand, she testified that she had been at a different bar on the night of the shooting. The prosecutor attempted to impeach her with a statement in which Smith is alleged to have described the shooting and identified Eaddy as the shooter.

32.     In response to this impeachment, Ms. Smith adamantly denied having given the statement. She also testified that she had no information about the shooting.

33.     Smith testified that she accompanied the detective to the station in March of 2009 only because she was threatened with arrest and conviction if she did not comply.

34.     The statement was fabricated by Detective Fetters who used threats and intimidation to bring Ms. Smith to the police station.

35.     Fetters testified that the statement was a "verbatim" transcription of Ms. Smith's exact words. This statement made under oath by Fetters was knowingly false, as evidenced by Ms. Smith's testimony and by the fact that Smith's signature did not appear on the statement.

36.     This fabricated statement, backed by Fetters' sworn testimony, was considered by the jury as substantive evidence of Mr. Eaddy's guilt and played a significant and material role in the wrongful conviction of Kareem Eaddy.

37.     Lakia Bunch was also called to testify as a witness to the shooting, but she too denied being at the bar at the time of the shooting or giving the police the statement attributed to her.

38.     Ms. Bunch testified that while she was at the bar on the night of June 21, 2008, she was only there for twenty minutes to wish her friend (not Mr. Lomax) a happy birthday and then she returned home because she was pregnant at the time.

39.     She was then confronted with a written statement that she allegedly gave the police, indicating that she had witnessed Mr. Eaddy shoot Mr. Lomax.

40.     Ms. Bunch insisted that she did not provide the police with the information contained in the written statement and that the signature and initials on each page were not in her handwriting.

41.     To authenticate and bolster the credibility of Ms. Bunch's alleged signed statement, the prosecution called Detective Ronald Dove.

42.     Detective Dove testified that he was uninvolved in the investigation of this case but that he sat in on Ms. Bunch's interview. He observed another detective interview Ms. Bunch and type her answers verbatim. Once the interview was completed, he testified that Ms. Bunch reviewed the statement and made certain corrections.

43.     The testimony of Dove was knowingly false and made a significant contribution to the jury's eventual finding of guilt against Kareem Eaddy.

44.     The prosecution also introduced evidence of Mr. Eaddy's arrest approximately one month after Lomax was murdered.

45.     On July 28, 2008, Mr. Eaddy was sitting on the steps of private property when two patrol officers drove by and asked Eaddy if he lived at the property. Mr. Eaddy allegedly cursed at the officers in response. Testimony at trial established that the officers then got out of their vehicle and approached Eaddy who attempted to flee from by running along the porches of the nearby homes.

46.     Police officer testimony at trial purported to establish that Mr. Eaddy dropped a gun while he was being pursued from porch to porch. The gun that was recovered in the course of this arrest was later alleged to be the same gun that was used in the Lomax murder by ballistics analysis.

47.     While Eaddy was arrested after being pursued by police, he never possessed the gun that he was alleged to have 'dropped' while trying to get away. On the contrary, there were numerous people on the steps with Eaddy on the night of his arrest. When the officers got out of

their vehicle, everyone who was gathered at that location hastily left the scene. At no time was the gun recovered from that arrest ever in Eaddy's possession.

48.    The fact that Eaddy never possessed the murder weapon is corroborated by the fact that no fingerprint analysis was ever admitted into evidence at trial.

49.    After hearing the witnesses' testimony and the parties' arguments, the jury deliberated, asking multiple questions to the presiding judge, including requesting crime scene photos and witness statements and requesting the definition of burglary. Notably, the jury requested copies of the alleged statements of Ms. Smith and Ms. Bunch to review.

50.    Finally, on February 9, 2011, the jury returned with a verdict, finding Mr. Eaddy guilty on all counts. He was thereafter sentenced to an aggregate term of life imprisonment.

51.    Mr. Eaddy always maintained his innocence, filing his direct appeal and subsequent post-conviction and habeas petitions.

52.    Years after the conviction, the Commonwealth recognized that one of the witnesses in Mr. Eaddy's underlying state case, Detective Dove, was involved in previously undisclosed misconduct. As a result, the Commonwealth voluntarily provided discovery to Mr. Eaddy and his counsel on this topic.

53.    Dove's history of misconduct is significant. Det. Dove pleaded guilty to hindering apprehension, obstructing the administration of law, unsworn falsification to authorities, tampering with evidence, and related charges for his role in interfering with a 2013 homicide investigation. As a result of his conduct, Det. Dove was fired in November 2013.

54.    In a second incident, Det. Dove was found to have abused his authority and violated police policy by improperly detaining a witness for 47 hours. The witness was not permitted to use the phone to arrange child care for her 11-year-old son or to notify her employer

of her absence. She was also given only a pretzel and soda during her detention. This incident,

which took place from June 1 to June 3, 2013, was substantiated by the Internal Affairs Division

of the Philadelphia Police Department.

55.     The parties engaged in voluntary discovery and Eaddy supplemented his pending

habeas petition.

56.     As a result of the allegations about Det. Dove and other disclosures of information

by the Commonwealth, Mr. Eaddy's attorneys interviewed Lakia Bunch about her interactions

with Det. Dove and the Philadelphia police. In April 2022, Bunch signed the attached affidavit.

In that affidavit, Bunch reaffirms her trial testimony disavowing her alleged statement to police.

She also provides additional information about her interview with Det. Dove and Det. Fetters that

was not previously disclosed to Eaddy. Specifically, in the affidavit, she states that the police told

her that they believed her boyfriend at the time was the motive for the homicide. Bunch refutes

that allegation by noting that her boyfriend was in jail at the time and that he did not know the

decedent. Further, Bunch states that she confided in a cousin following her trial testimony,

telling Honey Layton that she had not seen the shooting.

57.     The statement about Bunch's boyfriend was corroborated by documents in the

police file that Eaddy's attorneys reviewed in voluntary discovery. There were notes in the file

related to Bunch's boyfriend and the fact that the two had a relationship.

58.     Review of the signatures on the statement taken by Dove and Fetters compared to

signatures on Ms. Bunch's affidavit shows that the signatures on the statement allegedly given to

police were not signed by Ms. Bunch:

(fn. 9 con) Signatures from Bunch's purported statement dated 5/11/09:



Signature on Bunch's recent affidavit:     Signature on a notice of appearance dated 9/4/09 found in the homicide file:

Signature on the preliminary hearing subpoena from 2009:

59.     The Commonwealth conceded that, based on the affidavit, Ms. Bunch should have an opportunity to testify in the ongoing habeas litigation.

60.     The hearing was held on September 29, 2022, and only one witness—Lakia Bunch—took the stand. Following the hearing, the Commonwealth filed its formal response, agreeing that relief was warranted under the habeas statue.

61.     The habeas case was referred to Magistrate Judge Pamel A. Carlos who recommended relief on multiple counts, including the suppressed information regarding Ronald Dove's record of misconduct and unconstitutional police practices.

62.     Judge Carlos authored a Report and Recommendation which was filed by the Court on April 13, 2023. Thereafter the report and recommendation was adopted by the Honorable Gene E. K. Pratter of the Eastern District and a conditional writ was entered ordering the Commonwealth to release to retry Kareem Eaddy within 180 days.

63.     Mr. Eaddy's case then returned to the Pennsylvania Court of Common Pleas for re-trial. According to Common Pleas Court dockets, there was no activity on Mr. Eaddy case until August of 2024, approximately six months after Judge Pratter issued the Writ of Habeas Corpus. The federal docket indicates that the Commonwealth requested additional time to determine whether (or when) it would retry Mr. Eaddy.

64.     Months after he was granted relief, Kareem Eaddy was still imprisoned with no assurance as to when he would once again stand trial for a crime he did not commit. After having already served more than fourteen years in prison, and after having received an Order from the Court confirming that he was wrongfully convicted, Kareem Eaddy accepted a deal from the Commonwealth to plead to a lesser crime and secure his immediate release.

65.     The constitutional violations that give rise to this matter and are described above can be summarized as follows:

    a.  Fabrication and/or coercion of the statement of Lakia Bunch;

    b.  Fabrication and/or coercion of the statement of Renee Smith;

    c.  Willful suppression of information about Detective Dove's misconduct;

    d.   Deliberate deception in the form of knowingly false testimony by Fetters and

Dove.

**The Defendant Detectives' Conduct Was Caused By the PPD
Homicide Division's Longstanding History of Unconstitutional Practices
and the City of Philadelphia's Deliberate Indifference to Those Practices**

66.    The unconstitutional conduct of the defendant detectives described above was

directly and proximately caused by a long-established history of practices in the PPD in general

and specifically in the PPD Homicide Division.

67.    For many years, dating back at least to the 1970's, and continuing through and

beyond the time of the investigation into the death of Christopher Lomax, the City of

Philadelphia had in force and effect a policy, practice, or custom of unconstitutional misconduct

in homicide investigations, and in particular, using coercive techniques in interviews and

interrogations to obtain incriminating evidence; fabricating inculpatory evidence; conducting

improper identification procedures; concealing or withholding exculpatory evidence; tampering

with or manufacturing evidence; and fabricating incriminating statements from witnesses,

suspects, and arrestees.

68.    These practices were well known to the City of Philadelphia and its policymakers

as a result of newspaper investigations including Pulitzer Prize winning reporting in the

Philadelphia Inquirer in 1977, governmental investigations, complaints from lawyers and

civilians, and internal police investigations.

69.    Various cases demonstrate that this misconduct was pervasive within the PPD

prior to and around the time of the Lomax murder investigation and Mr. Eaddy's trial and

sentencing in 2011, and thereafter.

70.     As described in the 1977 *Philadelphia Inquirer* investigation, PPD homicide detectives routinely used beatings, threats of violence, intimidation, coercion and knowing disregard for constitutional rights in the interrogation of homicide suspects and witnesses, to wrench confessions from them, at the Roundhouse.  These cases, where the courts deemed the interrogations illegal and the confessions were thrown out, include the following:

a.    **James Howell**: On Dec. 3, 1971, James Howell, 18, was arrested for the rape, robbery and murder of Henrietta Tucker. The court ruled that Howell was subjected to "undue psychological duress" during a 20-hour interrogation, and his confession was thrown out.

b.    **Louis Roach**: In March 1972, Roach was a 20-year-old black suspect in the murder of a student. He was held at the Roundhouse for 19 hours, handcuffed to a metal chair, his face swollen and blood streaming from his nose and mouth. The court found that the interrogation was illegal, and that Roach was "the hapless victim of impermissible psychological coercion . . . by five detectives with interrogative expertise."

c.    **Larry Howard**: In April 1973, Larry Howard, 28, a black suspect in the shooting of two policemen, was kicked, beaten with a lead pipe and punched with handcuffs and brass knuckles during an interrogation ruled illegal by the Court.

d.    **John Wardlow**: On June 10, 1973, Wardlow, a 15-year-old sophomore, was arrested for the murder of another youth based solely on the basis of a tip that the homicide division altered to falsely incriminate him. Police interrogated him for more than 7 hours, during which time they hit him with a blackjack, poked him in the chest and punched him in the head. He agreed to sign a false confession out of fear and wanting to go home. Six months later, the court ruled the interrogation illegal and threw out the confession.

e.    **James Churchill**: In June 1973, James Churchill was picked up as a possible witness in the murder of his friend Reginald Adams. After he was forced to stay in an interrogation room over a period of approximately 27 hours during which eight interrogations were held, he allegedly confessed to the crime. The court threw out his confession.

f.    **Mary Kirkman**: On January 3, 1974, Kirkman was arrested as a suspect for murder. Police questioned her even after she refused to talk and asked to see a lawyer. Two and a half hours later, she still denied involvement in the shooting and refused to sign a statement.  Two hours later, her attorney arrived at the Roundhouse, but the detectives kept interrogating her for another 20 minutes.

Then Kirkman signed a statement admitting to some involvement in the shooting. Then she met with her lawyer, who instructed her to remain silent and told the detectives not to interrogate her anymore. After the lawyer left, Kirkman was still interrogated for another 19 hours, wherein she gave 3 more statements, which were progressively more inculpatory.  The court ruled the interrogation illegal because the police had cajoled and misled her and her statements were the product of psychological coercion.

71.    Other cases involving conducting improper identification procedures; concealing or withholding exculpatory evidence; tampering with or manufacturing evidence; and fabricating incriminating statements from witnesses, suspects, and arrestees, include:

a.    **Matthew Connor**: In 1980, Connor was convicted of the 1978 rape and murder of an 11-year-old girl whose body was found in the stairwell of an apartment building in Philadelphia. The medical examiner determined that the victim's wounds resulted from an ice pick. In 1989, while Connor was serving a life sentence, a non-profit organization persuaded the Philadelphia District Attorney's Office to revisit the case. The prosecution then discovered that police failed to turn over exculpatory evidence, including a recording of a call with a prosecution witness that contradicted her trial testimony, and evidence that police considered the victim's half-brother, who had a history of assaulting young girls and was observed carrying an ice pick around the apartment complex, as an alternative suspect. In February 1990, Connor was granted a new trial, and the next month the charges were dismissed.

b.    **Gerald Howell**: In late 1982 into the early months of 1983, Philadelphia Police Detectives coerced witnesses into inculpating Howell in a murder that was committed by Kenneth Parnell. PPD Detectives told Arlene Williams, a teenager at the time, that they would arrest Parnell, the father of her child, for the murder if she did not sign a statement inculpating Howell. PPD Detectives also threatened two other teenage witnesses with arrest if they did not come to court to testify against Howell, even though the police had reason to believe that Parnell was the real shooter. Additionally, PPD Detectives suppressed information given to them by the brother of the decedent that Parnell was the shooter. Years later, Parnell confessed to the murder for which Howell had been convicted. In 2022, the DAO conceded that the PPD had suppressed exculpatory evidence. In 2023, a federal judge granted Howell's habeas corpus petition and vacated his conviction. Howell was released in 2023 after being imprisoned for four decades for a crime he did not commit.

c.    **Bruce Murray and Gregory Holden**: In 1983, Murray and Holden were convicted of a 1980 murder based on PPD Homicide Division detectives knowingly presenting fabricated trial testimony, coercing false witness statements,

and suppressing exculpatory evidence. Murray and Holden were exonerated in April 2023 and January 2024 respectively based on the DAO's acknowledgement that numerous pieces of favorable evidence were suppressed during the original trial.

d.  **Alen Lee:** In September 1983, Alen Lee was arrested in connection with the murder of 25-year-old restaurant manager Jade Wong. The murder was committed by three Asian men who announced that they were gang members from New York City and who tried to extort Wong for money. Philadelphia detectives secured a conviction of Lee by fabricating an informant statement to implicate Lee, despite having credible information pointing to alternative suspects. Ultimately, Lee's conviction was vacated in April 2004 after Lee presented evidence that at the time of his trial, Philadelphia police failed to disclose evidence of the true perpetrators.

e.  **Willie Stokes**: In 1984, PPD detectives arrested a man named Franklin Lee on rape and related charges. After his arrest, homicide detectives interviewed him about a 1980 murder and falsely told him that another witness had identified Willie Stokes as the person who committed that murder. Detectives insisted that Lee knew that Stokes was the murderer and that he needed to cooperate with their investigation, or, otherwise they would "hang" him. Lee succumbed to the pressure and agreed to sign a false statement implicating Stokes in the murder. For years, Lee continued to have contact with the investigating detectives, who, in order to maintain control over their informant, arranged for him to have access to drugs and sexual encounters while incarcerated. Stokes remained wrongfully imprisoned for 39 years until December 2021 when a federal district court vacated his conviction based on the investigating detectives' pervasive misconduct.

f.  ***Commonwealth v. Raymond Carter*** – This matter, which was investigated from 1986 until his conviction in 1988, resulted in the exoneration of Mr. Carter after former police officer Thomas Ryan was indicted in February 1995 on federal corruption charges.  A Philadelphia judge ordered a new trial because the prosecution's star witness had been paid $500 by then-officer Ryan to testify against Carter.  The City of Philadelphia paid a "churchgoing grandmother" a significant settlement after she sued alleging Ryan helped frame her and send her to prison for 3 years.  In 1996, the Philadelphia Inquirer reported that Officer Jack Baird, who was Ryan's partner, fabricated evidence because Ryan wanted the overtime compensation often available to officers in murder investigations.

g.  **Curtis Crosland**: In 1987, PPD officers interviewed an informant with a long history of violent crimes who was seeking assistance from law enforcement to reduce his sentence for a parole violation. The informant told officers that Curtis Crosland had at some undetermined time in 1986, confessed that he committed a 1984 robbery and murder at a neighborhood grocery store in South Philadelphia. Investigating detectives knew that the informant's statement was false; the

informant had provided inconsistent information to police, had failed a polygraph, and had told other family members that another person—that is, not Curtis Crosland—had admitted to the crime. Despite this knowledge, detectives persisted in bringing charges against Crosland and then suppressed all information in their possession showing the falsity of the informant's testimony. Further, detectives suppressed and concealed information pointing to an alternative suspect—information that was highly credible as the suspect matched the size and description of the perpetrator given by eyewitnesses to the shooting. Crosland was convicted as a result of these unlawful police tactics and remained incarcerated for 34 years until an investigation by the CIU located he referenced exculpatory information in police files. In 2021, a federal district court accepted the CIU's concession that Crosland was entitled to relief and was likely innocent, and, therefore, vacated the conviction.

h. **Andrew Swainson**: PPD Homicide Division detectives based their 1988 arrest of Swainson on the testimony of a single witness who had been taken into custody while running from the scene of the murder in blood-soaked clothes. The witness provided a facially unbelievable narrative of the shooting after PPD detectives coerced him into identifying Swainson as the perpetrator. After this witness recanted his statements several times, PPD detectives pressured a different vulnerable young witness to support his false claims at trial. Based on this misconduct and the suppression of exculpatory evidence, in June 2020, Swainson's conviction was vacated and all charges were dismissed.

i. **Pedro Alicea:** In 1989, after failing for four years to resolve a 1985 double homicide of brothers Hector and Luis Camacho, PPD detectives fabricated a case against Pedro Alicea out of whole cloth. To build a false case against Alicea, detectives disregarded significant evidence demonstrating that two local drug dealers were responsible, and leaned on vulnerable individuals to obtain false identifications of Alicea as the shooter. The officers pressured Angel Fuentes, a longtime informant who had a close personal relationship with the lead detective, and who was facing significant prison time on a number of open charges, to endorse a fabricated statement identifying Alicea as the shooter. They then coerced Ray Velez, who had himself been implicated in the murders, to likewise falsely identify Alicea as the shooter, by detaining him and threatening to charge him with the murders if he did not submit. Detectives suppressed substantial exculpatory evidence, including a reliable eyewitness statement, pointing to the true perpetrators. Alicea was convicted as a result of the detectives' misconduct and wrongfully imprisoned for more than 31 years before the exonerating evidence was discovered by the CIU, resulting in the vacatur of his conviction and release in 2020.

j. **Donald Ray Adams**: PPD Homicide Division detectives coerced a witness to implicate Adams in a 1990 murder by threatening the witness and also offering to provide her financial support for her testimony. In securing the statement,

detectives ignored the fact that Adams's physical description was vastly different from the description provided by witnesses at the scene. Adams's conviction was later vacated, and he was acquitted at a retrial. His subsequent civil suit resulted in a financial settlement.

k. **Ronald Johnson**: Following a 1990 homicide, PPD Homicide Division took nine different statements from two witnesses who had initially exculpated Johnson and coerced them until they agreed to inculpate him. Johnson spent 34 years in prison before the DAO located suppressed evidence of the coercion in police files. Based on this buried evidence of police misconduct, Johnson's conviction was vacated in March 2024.

l. **James Dennis**: PPD Homicide Division detectives investigating a murder in 1991 coerced witnesses to identify Dennis while at the same time they intentionally concealed information which provided Dennis with incontrovertible alibi. The detectives' conduct led to the Third Circuit's issuance of an en banc decision concluding that the concealment of evidence violated Dennis's due process rights. See Dennis v. Sec'y, Pa. Dep't of Corr., 834 F.3d 263, 307 (3d Cir. 2016). In 2024 an Eastern District of Pennsylvania jury found two investigating detectives liable for Dennis's wrongful conviction and awarded Dennis $16 million.

m. **Anthony Wright**: Wright was convicted of the 1991 rape and murder of an elderly woman based on Homicide Division detectives' fabrication of a confession and planting of evidence. DNA testing later confirmed Wright's innocence, and he was acquitted at a retrial. His subsequent civil rights action litigated in this Court resulted in a settlement of nearly $10 million.

n. **Troy Coulston**: In 1991, Coulston was convicted of a 1989 murder based on PPD Homicide Division Detectives knowingly presenting fabricated trial testimony, coercing false witness statements from a particularly vulnerable, teenage witness, and suppressing exculpatory evidence undermining the credibility of a key witness, that actual perpetrator of the murder. Mr. Coulston's conviction was vacated in 2021 based on the discovery of previously suppressed exculpatory evidence.

o. **Walter Ogrod**: In 1992, PPD detectives coerced and fabricated a false confession from Ogrod, a trucker with a low-average IQ, to the 1988 murder of a four-year-old girl. Ogrod had driven all night and had not been to bed in 36 hours when the lead detective interrogated him. Detectives interrogated Ogrod for hours, then wrote out a fabricated statement in Q-and-A form they falsely claimed was a verbatim record of a voluntary statement from Ogrod, and coerced Ogrod into signing it. At his first trial, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch,

18

the state convicted Ogrod of capital murder. Ogrod has since been exonerated, the charges nolle prossed, and he was released from prison after serving more than 25 years for a crime he did not commit.

p. **Chester Hollman**: PPD detectives framed Chester Hollman for a 1991 murder he did not commit. Detectives coerced a witness, Deirdre Jones, who had no knowledge of the crime, to provide a false statement implicating the innocent Hollman; they typed out a statement implicating Hollman, falsely attributed it to Jones, and coerced her into signing it. Detectives also fabricated and coerced a statement from another witness, and buried evidence demonstrating Hollman's innocence. In 2019, Hollman was exonerated based on DNA testing excluding him and pointing to another perpetrator. He had spent 28 years wrongly imprisoned.

q. **Willie Veasy**: Veasy was convicted of a murder based on a 1992 confession secured by PPD Homicide Division Detectives' use of physical force. The confession was plainly untrue in light of a fully corroborated alibi that Veasy was working in a popular and busy restaurant at the time of the murder. Veasy's conviction was vacated in 2019 upon the motion of the Philadelphia District Attorney's Office, and his subsequent civil rights suit resulted in a multi-million-dollar settlement.

r. **Percy St. George**: A PPD Homicide detective coerced two people in 1993 to give false statements implicating St. George in a murder. When the detective was asked to testify about the allegations of coercion and fabrication, he asserted his Fifth Amendment privilege against self-incrimination and declined to answer questions. Despite that assertion, the detective was permitted to remain active in PPD Homicide Division investigations for several years.

s. **Johnny Berry**: PPD homicide detectives arrested 16-year-old Johnny Berry for a 1994 robbery murder based on the testimony of an eyewitness who was in the company of the murder victim and the testimony of an alleged accomplice, Tauheed Lloyd. At trial, the eyewitness claimed that detectives had pressured her into identifying Berry and Berry was convicted based solely on Lloyd's testimony. Several years later, Lloyd acknowledged that he had lied about Berry. In 2019, the DAO agreed to vacate Berry's conviction, after which Berry learned that detectives had suppressed information regarding multiple witnesses who had heard Lloyd admit that he, not Berry, was the shooter. Berry's civil suit settled for $5.65 million.

t. **Terrence Lewis:** PPD detectives fabricated evidence and committed other serious investigative misconduct to convict Lewis of a 1996 murder he did not commit. This included coercing and fabricating witness statements and identifications, and

deliberately hiding key exculpatory evidence that would have demonstrated Lewis's innocence. In 2019, Lewis was exonerated after he spent 21 years wrongly imprisoned.

u. **John Miller**: In June 1997, Miller was arrested for the 1996 murder of Anthony Mullen based on a statement PPD detectives obtained from alleged witness David Williams. Williams recanted during a 1997 preliminary hearing and at trial in 1998. Investigating detectives knew Williams's statement was untrue as he had given them provably false information on other subjects, but they failed to disclose their knowledge of this information undermining Williams's credibility. They continued to withhold that information for years, even after Williams confessed that he was the person who had committed the murder. In 2019, a federal district court vacated Miller's conviction based on its finding that investigating detectives had suppressed critical information undermining the inculpatory evidence presented at trial, and the DAO subsequently dismissed all charges, stating that Miller had "met his burden of proving his innocence.

v. **Eugene Gilyard and Lance Felder**: In 1998, Gilyard and Felder were arrested and subsequently convicted of the 1995 murder of Thomas Keal. During a cold-case investigation more than two years after the crime, PPD detectives fabricated and coerced witness identifications and statements and buried exculpatory evidence in order to secure charges against Gilyard and Felder. For example, after witness Keith Williams initially told detectives Felder was not a person he had seen at the time of the crime, detectives coerced Williams to identify Felder's photograph by visiting Williams's home multiple times, cursing and shouting at him, pushing on his head while pointing to Felder's photo. Similarly, after witness Patrick Harris told detectives he did not recognize anyone in the photo arrays he had been shown, detectives fabricated a report stating that Harris had identified Gilyard, when he had not. The true perpetrator confessed in 2011, confirming Gilyard and Felder's innocence, and in 2013 their convictions were vacated. In 2018, Gilyard and Felder reached a settlement with the City for compensation for their wrongful convictions.

w. **William Johnson**: In September 2005, PPD Homicide Division detectives arrested Johnson for the shooting of an off-duty Philadelphia police officer after he had solicited a sex worker. Detectives pressured two sex workers who had been in the area to identify Johnson and another man as the shooter. In 2023, after the CIU produced materials proving that at least one of the witnesses had been coerced to testify against Johnson, habeas relief was granted, and Johnson was released after 18 years' imprisonment.

x. **Recco Ford**: In 2007, detectives acting on an unsubstantiated anonymous tip detained two juvenile witnesses without their parents' knowledge and pressured them to identify 16-year-old Recco Ford as the perpetrator of a murder that

occurred at a playground in southwest Philadelphia. Ford spent three years in pre-trial detention before his trial where, based on the testimony of two teenaged girls who had seen the shooting and called 911 to report it and who confirmed that Ford was not the perpetrator, he was acquitted. Ford later sued the detectives who caused his prosecution, and the City of Philadelphia settled his lawsuit for several hundred thousand dollars.

y. **Steven Lazar**: Lazar was convicted of a 2007 murder as a result of PPD Homicide Division Detectives fabricating witness statements from vulnerable individuals and securing a false confession by knowingly subjecting Lazar to more than 30 hours of interrogation while he was undergoing severe opioid withdrawal. Lazar's conviction was vacated in March 2023 based on the discovery of suppressed evidence after he had spent approximately 16 years in prison.

72.    The City's indifference to the misconduct that gave rise to the above-listed wrongful convictions and misconduct has continued unabated through today. Public news reporting documented that of over 41 cases resulting in exonerations between 2018 and 2025, PPD detectives have conducted only limited investigation into a small number of those cases. Instead of seeking to find the actual perpetrators of the violent crimes giving rise to these prosecutions and instead of remedying unlawful police misconduct, the City has chosen inaction.

73.    As evidenced by the pervasive nature of the conduct and the continuing indifference of the City in these cases, detectives in the PPD Homicide Division had free reign to engage in unconstitutional actions with the knowledge and acquiescence of City policymakers and PPD Homicide Division supervisors and command staff, all of whom were deliberately indifferent to this misconduct.

74.    At the time of the investigation of the Lomax murder, and the prosecution of Mr. Eaddy between 2008 and 2011, the PPD had a policy, practice, or custom of coercing confessions and false statements from witnesses, concealing and withholding exculpatory evidence, creating fabricated evidence, and initiating prosecutions without probable cause.

21

75.     These practices, as exemplified by the investigations in Mr. Eaddy's case and in those detailed above, continued for years due to the deliberate indifference of the City of Philadelphia.  Those practices date back for decades.  These practices were well known to Defendant City, and its policymakers, with respect to criminal investigations and prosecutions as a result of newspaper investigations, including Pulitzer Prize winning reporting in the Philadelphia Inquirer in 1977-1978, governmental investigations, complaints from lawyers and civilians, and internal police investigations, including the PPD's 39th District Corruption Scandal in the 1990's, complaints lodged by the public, prior litigation and internal police investigations.

76.     The 39th District Corruption Scandal involved widespread unconstitutional practices that were not appropriately addressed or remediated despite pervasive knowledge throughout the PPD and Defendant City. The police misconduct in the 39th District Corruption Scandal included constitutional violations that mirror those violations suffered by Kareem Eaddy including omission of material information and suppression of exculpatory evidence, physical abuse and coercive interrogation tactics, and false allegations of criminal conduct. The PPD was deliberately indifferent to the officer's misconduct and credible complaints to their internal compliance department were disregarded.

77.     As a result of a pattern of police misconduct that was in effect at the time of the investigation of the murder of Christopher Lomax for which Kareem Eaddy was charged, the United States District Court for the Eastern District of Pennsylvania entered a consent decree in the matter of *NAACP v. City of Philadelphia* requiring widespread reforms in the PPD, while also limiting certain aspects of their investigative practices and policies.

78.     This practice, as exemplified by the investigation into Mr. Eaddy's wrongful conviction, and those detailed hereinabove, continued for years due to the deliberate indifference of the PPD and Defendant City to these policies, practices and customs.

79.     During the 1990's and 2000's, and including the time of the investigation and prosecution of Kareem Eaddy by the PPD, there was, within the PPD a pattern, practice and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments. On three (3) separate occasions in the 1980's, courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from engaging in these practices:

    a.  **Cliett v. City of Philadelphia**: Consent decree arising out of "Operation Cold Turkey", that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices);

    b.  **Spring Garden Neighbors v. City of Philadelphia**: Enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation);

    c.  **Arrington v. City of Philadelphia**: Enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

80.     In a more recent investigation into wrongful convictions in Philadelphia, Inquirer reporter Samantha Melamed spoke with former homicide detective Michael Chitwood. Chitwood, who went on to a long career as Upper Darby Police Chief, admitted to the Inquirer that training of homicide detectives was known to be inadequate:

Back then, police didn't have the ample data available today: cellphone records, DNA analysis. And, like now, they were facing upward of 400 murders a year, hampered by witnesses too fearful to come forward. **Chitwood said detectives were not formally trained to meet that challenge. They handled cases as they saw fit.**

81.     "There was no set standard. It was just: Solve the case," Chitwood said.

Philadelphia Inquirer, Losing Conviction, May 7, 2021;

https://www.inquirer.com/crime/a/philadelphia-murder-exonerations-wrongful-convictions-

20210507.html

    82.    In summary, at the time of the investigation and prosecution of Kareem Eaddy the

PPD and its policymakers were deliberately indifferent to PPD's practice, policy and custom of:

    a.   Concealing and/or failing to disclose exculpatory evidence, engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect statements, and using improper identification procedures, and using these practices to target people of color for unlawful treatment;

    b.   Allowing detectives to engage in illegal and coercive tactics to secure evidence in homicide cases.

    c.   Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct;

    d.   Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

    e.   Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and Defendants, including unlawful police interrogations, searches, arrests, coercion of witnesses, falsifying and fabrication of evidence and suppression of exculpatory evidence;

    f.   Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging PPD police, including the Defendants in this case, to violate the rights of citizens, such as Kareem Eaddy.

    83.    At the time of the investigation and prosecution of Kareem Eaddy, and for many

years before and thereafter, the PPD and Defendant City has been deliberately indifferent to the

need to train, supervise and discipline police officers. The Internal Affairs Division ("IAD") of

24

the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful

disciplinary and remedial actions in the following respects:

    a.   excessive and chronic delays in resolving disciplinary complaints;

    b.   a lack of consistent, rational and meaningful disciplinary and remedial actions;

    c.   a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

    d.   the PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

    e.   the PPD discipline, as practiced, was incident-based rather than progressive, thus, repeat violators were not penalized in proportion to the number of violations;

    f.   the conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

    g.   a global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

    h.   serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

    i.   lack of an effective early warning system to identify, track and monitor "problem" officers;

    j.   IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct, interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

    k.   IAD failed to acknowledge the disproportionate use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

84.     The PPD's conduct in this case was not an isolated incident and was instead the result of customs, policies and practices of the PPD prior to and at the time of the unlawful investigation into the murder at issue. The PPD, by and through its final policy makers, maintained an official policy, pattern, practice, or custom of the use of coercive techniques in interviews and interrogations to obtain confessions; the fabrication of inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of exculpatory evidence in violation of Kareem Eaddy's and others' constitutional rights.

85.     Further, the PPD failed to train, educate, and supervise officers including Defendants Dove and Fetters regarding proper conduct in police work and investigations. Thus, the Defendant Detectives and the PPD officers were inadequately educated and trained about their constitutional and ethical responsibilities to criminal defendants. The lack of oversight of Defendant Detectives and other homicide detectives in the PPD by the PPD compounded the constitutional violations by eliminating any mechanism by which such violations would be identified and rectified.

86.     Yet, the PPD and Defendant City, by and through its final policymakers, implemented the policy, practice and customs of coercing jailhouse informants or other criminal defendants into adopting fabricated statements for use in prosecuting and convicting persons of interest in deliberate indifference to the substantial likelihood that these customs, practices, and policies would result in constitutional violations like those that occurred in Kareem Eaddy's case.

87.     Such policies, customs and practices of the PPD were the moving force behind Detectives Dove's and Fetters' fabrication and/or coercion of false statements of witnesses in this

case; the intentional concealment of Detective Dove's record of wrongdoing and unconstitutional conduct, and the giving of false testimony in court.

## DAMAGES

89.    The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and the City of Philadelphia caused Mr. Eaddy to be improperly arrested and subjected to the horrors of imprisonment, unfairly tried, wrongfully convicted and forced to serve more than 40 years in prison for a crime he did not commit.

90.    As a direct result of Defendants' conduct and omissions, Mr. Eaddy sustained injuries and damages, including loss of freedom for more than 14 years, loss of his youth, loss of his relationships with family members, pain and suffering, mental anguish, emotional distress, countless indignities, degradation, permanent loss of natural psychological development, loss of life's pleasures, and restrictions on all forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, voting, travel, enjoyment, and freedom of speech and expression.

91.    As a direct result of Defendants' conduct and omissions, Mr. Eaddy sustained economic injuries and damages, including loss of income from the employment he maintained before his wrongful arrest and incarceration and the loss of career opportunities.

92.    As a direct result of Defendants' conduct and omissions, Mr. Eaddy sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

**COUNT I**
**42 U.S.C. § 1983: Deprivation of Liberty Without Due Process of Law**
**Under the Fourteenth Amendment and Denial of a Fair Trial by**
**Fabricating Evidence and Withholding Material Exculpatory and Impeachment Evidence**
**(Against All Individual Defendants)**

93.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

94.    The individual Defendants, acting individually and in concert, and within the course and scope of their employment with the Philadelphia Police Department deprived Mr. Eaddy of his clearly established constitutional right to due process of law and to a fair trial by fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain inculpatory witness statements, including without limitation the false statements of witnesses described above.

95.    The individual Defendants deprived Mr. Eaddy of his right to a fair trial by intentionally withholding, concealing and/or suppressing material exculpatory and impeachment evidence, as previously described herein.

96.    The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Eaddy's clearly established constitutional rights.  No reasonable officer in 2008-2011 would have believed this conduct was lawful.

97.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Eaddy's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Eaddy's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT III
### 42 U.S.C. § 1983: Civil Rights Conspiracy
### (Against All Individual Defendants)

88.     The individual Defendants, acting within the course and scope of their

employment and under color of state law, agreed among themselves and with other individuals to

act in concert in order to deprive Mr. Eaddy of his clearly established Fourth, and Fourteenth

Amendment rights to be free from unreasonable searches and seizures, false arrest, false

imprisonment, deprivation of liberty without due process of law, and his right to a fair trial.

89.     In furtherance of the conspiracy, the Defendants engaged in and facilitated

numerous overt acts, including, without limitation, the following:

    a.  Suggesting, coercing, and/or fabricating false, inculpatory evidence in the form of
witness statements;

    b.  Intentionally or with deliberate indifference failing to comply with their duty to
disclose *Brady* and impeachment material during the pendency of the case; and

    c.  Committing perjury during hearings and trials.

90.     Defendants' acts and omissions, as described in the preceding paragraphs, were

the direct and proximate cause of Mr. Eaddy injuries.  Defendants knew, or should have known,

that their conduct would result in Mr. Eaddy's wrongful arrest, prosecution, conviction, and

incarceration.

## COUNT IV
### 42 U.S.C. § 1983: Municipal Liability Claim
### (Against Defendant City of Philadelphia)

91.     The preceding paragraphs are incorporated by reference as though fully set forth

herein.

92.     The City of Philadelphia, by and through its final policymakers, had in force and

effect during the time of Mr. Eaddy's wrongful arrest and conviction, and for many years

preceding and following this investigation, a policy, practice, or custom of unconstitutional misconduct in homicide and other criminal investigations, including in particular the use of coercive techniques in interviews and interrogations to obtain confessions; the fabrication of inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of exculpatory evidence.

93.    Final policymakers for the City of Philadelphia had actual or constructive notice of these practices, policies, and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions; withholding exculpatory evidence; fabricating inculpatory evidence; and, particularly, fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime, and failed to take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

94.    Mr. Eaddy's injuries and damages were further proximately caused by policies and practices on the part of policymakers with responsibility of administration of the District Attorney's office to allow the withholding of exculpatory and/or inconsistent evidence, allow witnesses to provide false testimony, and to pursue profoundly flawed investigations and prosecutions.

95.    The widespread practices described in the preceding paragraphs, of which the City of Philadelphia had actual or constructive notice, were allowed to flourish because the Police Department and District Attorney's office declined to implement sufficient training and/or any legitimate mechanisms for oversight or punishment.

96.    Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Mr. Eaddy's arrest, prosecution, and conviction and over 14 years of incarceration, as well as all the other injuries and damages set forth above.

## PUNITIVE DAMAGES

97.    The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

98.    The conduct of the individual Defendants was outrageous, malicious, wanton, willful, reckless, and intentionally designed to inflict harm upon Plaintiff.

99.    As a result of the acts of the Defendants alleged in the preceding paragraphs, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff requests the following relief:

a.    That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

b.    That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

c.    A declaratory judgment that the practices and policies complained of are unconstitutional;

d.    For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

e.       For such other and further relief as appears reasonable and just.

MARRONE LAW FIRM, LLC

By:_____s/ Michael D. Pomerantz_____
          Michael D. Pomerantz, Esquire
          PA Atty ID# 83415
          Attorney for Plaintiff
          200 South Broad Street, Suite 610
          Philadelphia, PA  19102
          (215) 732-6700
          mpomerantz@marronelaw.com
          Date: February 26, 2026